# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARLES WESLEY BLACKLEDGE, ) | |
| ) | |
| Petitioner, ) | |
| ) | Civil Action No. 16-1004 |
| v. ) | |
| ) | District Judge Nora Barry Fischer |
| OLGA GRIGORIEVNA BLACKLEDGE, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION

**I.  INTRODUCTION**

Presently before the Court is the Verified Complaint and Petition for Return of Child ("Complaint and Petition") (ECF No. 1) filed – *pro se* – by Charles Wesley Blackledge ("Petitioner") on July 6, 2016, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), as codified by the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 *et seq.* ("ICARA"). Petitioner is a resident of Berlin, Germany seeking the return of his minor child ("J.B.")[1] from Pittsburgh, Pennsylvania, U.S.A, where J.B. resides with his mother Olga Grigorievna Blackledge ("Respondent"). This Court exercises subject-matter jurisdiction pursuant to 42 U.S.C. § 11603(a). For the reasons that follow, the Court has DENIED all relief sought in Petitioner's Complaint and Petition.

---

[1] In accordance with Local Rule 5.2(D)(2), the Court shall refer to the minor child by initials.

## II.   FACTUAL & PROCEDURAL BACKGROUND[2]

### A. Facts

Petitioner, a citizen of the United States of America, lives and works in Berlin, Germany as a European Patent Attorney Candidate. He has worked in Germany since June 17, 2011. Respondent, a citizen of Ukraine, attends graduate school at the University of Pittsburgh, located in Pittsburgh, Pennsylvania. She is a Ph.D. candidate. The parties' minor child J.B. has most recently resided with Respondent in Pittsburgh since August 2015. J.B. completed the second grade at Pittsburgh Colfax K-8 ("Colfax") primary school in the neighborhood in which the child and Respondent reside – Squirrel Hill.

Petitioner and Respondent first met in the United States, and Petitioner moved soon after to Kharkiv, Ukraine, where Respondent lived and worked. The couple was married in Kharkiv on March 7, 2008, and J.B. was born in Kharkiv on June 26, 2008. In addition to having Ukrainian citizenship, the parties applied for – and received – American citizenship for J.B. The parties resided in Kharkiv until Petitioner obtained employment in Ireland around January 2009. The parties and J.B. thereafter resided in several European nations for varying periods of time. In June or July 2011, Petitioner began his current position in Germany. Around the same time, Respondent was accepted into graduate school at the University of Pittsburgh.

The parties traveled together to Pittsburgh in August 2011, and established a residence for Respondent and J.B. Petitioner thereafter remained in Germany to continue his new job. Respondent and J.B. remained in Pittsburgh for two years while Respondent attended graduate school. Respondent and J.B. then returned to Germany in August 2013 to live with Petitioner. Respondent was able to continue her graduate studies remotely. J.B. was enrolled in a bicultural

---

[2]   Due to the expedited nature of the instant action, trial transcripts were not available at the time of drafting this Memorandum Opinion for purposes of citation.

German-American primary school ("JFK School"), where the child completed kindergarten and first grade during the 2013 – 14 and 2014 – 15 academic years. After approximately two years in Germany, Respondent determined that she would need to return to Pittsburgh to complete her graduate degree. The parties agreed that J.B. would accompany Respondent back to Pittsburgh. Upon their return to Pittsburgh in August 2015, J.B. was enrolled in Colfax for the second grade. Respondent continued her graduate studies and Petitioner continued to work in Germany.

The parties' relationship had been strained for some time prior to the instant case and Respondent's return to Pittsburgh. However, once back in Pittsburgh, the marriage became so acrimonious that Respondent filed for divorce in the Court of Common Pleas of Allegheny County, Pennsylvania on April 7, 2016. A custody action was also filed by Respondent in Allegheny County on May 6, 2016. Petitioner disputed that the Court of Common Pleas had jurisdiction over custody of J.B.; Petitioner contended that Germany was the proper venue for their custody dispute. Petitioner also demanded the return of J.B. to Germany, and the parties began to dispute the terms of an alleged pre-existing oral agreement regarding how long J.B. was supposed to live in Pittsburgh with Respondent before returning to Germany.

**B. Procedural History**

Petitioner subsequently filed his Complaint and Petition on July 6, 2016, seeking to have J.B. returned to Germany. (ECF No. 1). A Motion for an Expedited Hearing (ECF No. 2) and brief in support (ECF No. 3) were also filed by Petitioner on July 6. The Court thereby convened a status conference on July 14, 2016, Petitioner appearing by telephone due to illness and Respondent appearing before the Court in-person; neither party was represented by counsel at that time. (ECF No. 14). At the conclusion of the conference, the Court set the briefing

schedule, set the date for trial, and referred the parties to mediation.³ (ECF Nos. 15 and 16). Mediation was ultimately unsuccessful. (ECF No. 27). On July 20, 2016, Barbara Ernsberger entered her appearance as counsel for Respondent. (ECF No. 20). Respondent filed her Answer to the Complaint and Petition on August 1, 2016. (ECF No. 28). The parties submitted respective trial briefs on August 9, 2016. (ECF Nos. 34 and 38).

On August 15, 2016, the Court conducted an *in camera* interview of J.B. (ECF No. 58). A bench trial was then held on August 16 and 17, 2016. (ECF Nos. 59 and 61). Consequently, on August 19, 2016, the Court issued an Order denying all relief sought in Petitioner's Complaint and Petition based upon the credible testimony of the witnesses examined at trial, the exhibits admitted on the record, and the parties' arguments. (ECF No. 63). This opinion in support of the Court's Order of August 19 now follows.

### III. LEGAL STANDARD

Two principal objectives are established in Article 1 of the Hague Convention, namely: "(a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and (b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."⁴ *Karpenko v. Leendertz*, 619 F.3d 259, 263 (3d Cir. 2010). In achieving these objectives it is not the purpose of the Hague Convention and ICARA to coopt federal courts into resolving international custody disputes, but to designate the federal courts as a forum for determining the proper venue for custody disputes. In short, the Hague Convention and ICARA provide "a legal process 'to restore the status quo

---

³ Local Rule 16.2 requires parties involved in all civil actions to agree upon a form of alternative dispute resolution as part of the litigation process. United States District Court, Western District of Pennsylvania, http://www.pawd.uscourts.gov/alternative-dispute-resolution.

⁴ Both the United States and Germany are "Contracting States" under the Hague Convention.

4

prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases.'" *Id.* (quoting *Yang v. Tsui*, 499 F.3d 259, 270 (3d Cir. 2007)).

In cases filed pursuant to the Hague Convention and ICARA, it is the initial burden of the petitioner to demonstrate by a preponderance of the evidence that a child habitually resident in a Contracting State was wrongfully removed to, or retained in, another Contracting State. *Karpenko*, 619 F.3d at 263 (citing *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006)). Such a showing requires proof (1) of removal or retention of a child; (2) of the child's habitual residence immediately prior to such removal or retention; (3) that the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (4) that the petitioner was exercising his or her custody rights at the time of removal or retention. *Chafin v. Chafin*, -- U.S. --, 133 S.Ct. 1017, 1021 (2013); *Karpenko*, 619 F.3d at 263 (citing *Yang*, 499 F.3d at 270 – 71).

A respondent may rebut this showing by proving one of five affirmative offenses:

> (1) that a grave risk that the child's return would expose him or her to physical or psychological harm or otherwise place the child in an intolerable situation by clear and convincing evidence; (2) that the child's return would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms by clear and convincing evidence; (3) that the child is now settled in his or her new environment by preponderance of the evidence; (4) that the person from whom the child was removed was not exercising custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention by preponderance of the evidence; or (5) that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views by preponderance of the evidence.

*Karpenko*, 619 F.3d at 263 n. 3 (citing 42 U.S.C. § 11603(e)(2)).

**IV.    DISCUSSION**

In his Complaint and Petition, and trial brief in support thereof, Petitioner argues that he and Respondent had a verbal agreement by which J.B. was to accompany Respondent to

5

Pittsburgh for one year while Respondent completed her graduate degree, and after which J.B. would return to Germany to continue at the JFK School for the 2016 – 17 academic year. (ECF Nos. 1 ¶ 28; 38 at 12 – 15). Petitioner asserted that he maintained regular contact with J.B. via video conferencing during J.B.'s time in Pittsburgh, and visited J.B. in the United States for extended periods during the Christmas and Easter holidays. (ECF No. 1 ¶30; 38 at 16).

Beginning in January and February 2016, Petitioner began exchanging emails with Respondent to make arrangements for J.B.'s return to Germany for the following school year. (ECF Nos. 1 ¶¶ 32 – 33; 38 at 11). At this point the parties began to debate whether there had been an agreement that J.B. was to return to Germany after a definite period of time. Following the filing of Respondent's suit for custody of J.B. on May 6, 2016, Petitioner states that Respondent unequivocally informed him on May 26, 2016 that she would not return J.B. to Germany. (ECF Nos. 1 ¶¶ 37 – 38; 38 at 11). Petitioner contends that Respondent's conduct constitutes wrongful retention in violation of the Hague Convention and ICARA, because Germany was J.B.'s habitual residence and the parties had previously agreed that J.B. would not remain in Pittsburgh for more than a year.

In her Answer and trial brief in support thereof, Respondent disputes that there was ever an agreement for J.B. to leave Pittsburgh after a defined period of time. (ECF Nos. 29 ¶¶ 24 – 25, 28, 32, 36, 39; 34 at 7, 14 – 15). Respondent recounts that the parties had agreed only that J.B. was to accompany Respondent to Pittsburgh until she obtained her graduate degree. (*Id.*). Respondent admitted that during conversations with Petitioner, she acknowledged that it could take as little as one year; however, she denied that she committed to a specified time frame. (*Id.*). Regardless of the amount of time ultimately spent in Pittsburgh, Respondent argues that the parties agreed J.B. would live with her in Pittsburgh. (*Id.*).

6

**A. Removal and Retention**

The first inquiry before the Court is the date of removal and/or retention of J.B. by Respondent. There was clearly no "removal" in this case, because Respondent had Petitioner's consent to take J.B. to Pittsburgh. This does not rule out retention of J.B. by Respondent, however. The unequivocal testimony of Petitioner at trial was that he acceded to Respondent's alleged request that J.B. live with her in Pittsburgh for a period of one year. Assuming, *arguendo*, that this was in fact the agreement, J.B. could not have been retained by Respondent any earlier than August 2016 – one year from the date of Respondent and J.B.'s return to Pittsburgh.[5] *See Karkkainen*, 445 F.3d at 290 (citing *Slagenweit v. Slagenweit*, 841 F.Supp. 264, 270 (N.D. Iowa 1993)) ("The wrongful retention does not begin until the noncustodial parent…*clearly* communicates her desire to regain custody and asserts her parental right to have [her child] live with her."). As a result, the Court finds that J.B. was retained by Respondent beginning in August 2016.

**B. Habitual Residence**

Having determined that J.B. was not retained for Hague Convention and ICARA purposes, the Court must now resolve the "threshold question" of J.B.'s place of habitual residence immediately prior to his retention by Respondent. *Karkkainen*, 445 F.3d at 287 (citing *Feder v. Evans-Feder*, 63 F.3d 217, 222 (3d Cir. 1995)). "Habitual residence" is the place in which a child "'has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective.'" *Karpenko*, 619 F.3d at 263 (quoting *Karkkainen*, 445 F.3d at 291 – 92). If a child has been retained in his or her place of habitual residence, then his or her retention there is not considered wrongful. *Karkkainen*, 445

---

[5] Petitioner was aware of J.B.'s participation in various camps around Pittsburgh throughout the summer of 2016, and acquiesced to same.

F.3d at 291. Accordingly, Petitioner must demonstrate by a preponderance of the evidence that J.B. was a habitual resident of Germany.

However, "[t]he inquiry into a child's habitual residence is a fact-intensive determination that cannot be reduced to a predetermined formula and necessarily varies with the circumstances of each case." *Karkkainen*, 445 F.3d at 291 (citing *Whiting v. Krassner*, 391 F.3d 540, 546 (3d Cir. 2004)). Cases in which the petitioning parent may have agreed to allow a child to live abroad for an indefinite period, but subsequently retracted that decision, "'generally have no clear answer and are very fact-dependent.'" *Id.* (quoting *Whiting*, 391 F.3d at 549). While the intent of the parents must be considered when finding habitual residence, the primary emphasis is upon the child. *Yang*, 499 F.3d at 272.

Habitual residence is a "concept that focuses on past experience, not future intentions." *Karkkainen*, 445 F.3d at 294 (citing *Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993)). To that end, the Court examines a child's experiences in, and contacts with, his or her place of residence to determine whether he or she is "firmly rooted," and not merely acculturated. *Karkkainen*, 445 F.3d at 292 – 93. A child's academics, social engagement, participation in extracurricular activities, and routines are all central to finding acclimatization and a settled purpose. *Id.* Simply put, there "must be 'a sufficient degree of continuity.'" *Yang*, 499 F.3d at 272 (quoting *Feder*, 63 F.3d at 223).

In the instant case, the credible facts of record are strongly suggestive of a degree of continuity and settled purpose sufficient for the Court to find that J.B. – notwithstanding his American citizenship – is acclimatized to Pittsburgh. Academically, J.B.[6] achieved excellent

---

[6] Although J.B. is only eight (8) years of age, the Court found him to exhibit an unusual degree of maturity and situational awareness. As such, the Court has accorded his personal *in camera* testimony significant weight. *See Blondin v. Dubois*, 238 F.3d 153 (2d Cir. 2001) (district court properly gave weight to eight year old child's testimony based upon maturity); *See also Mertens v. Kleinsorge-Mertens*, -- F.Supp.3d --, 2015 WL 9943589

8

marks in the second grade at Colfax. (Exhibit D20). Although he is familiar with the German, Ukrainian, and Russian languages, English is J.B.'s primary language. Upon arrival at Colfax, J.B. initially lagged behind his peers with his readings skills; however, by the end of the school year he was performing well. He made many friends at school, and his teacher described him as well-liked. J.B. liked that Colfax had a library and a book fair – things that the JFK School in Germany did not have. He also pointed out that he liked the field trips provided by Colfax school. J.B. looked forward to attending Colfax for the third grade.

J.B. noted that he had made a number of close friends, and occasionally had sleep-overs. He had seven friends attend his birthday party in June 2016, and had been invited to others' birthday parties over the course of the previous year. Plaintiff was active in extracurricular activities such as soccer, swimming, and robotics, in which he was as a member of several teams. His robotics team was ranked twenty-ninth, nationally. (Exhibit D26). Following the conclusion of the 2015 – 16 schoolyear, J.B. attended several summer camps, including two at the Carnegie Museum of Art and Natural History. He made additional friends at these camps.

In his *in camera* interview, J.B. demonstrated to the Court that he was aware of his place in Pittsburgh – easily recalling that he lived in an apartment on Hobart Street in the neighborhood of Squirrel Hill. Incidentally, he also remarked that he looked forward to moving into a house in Pittsburgh so that he could get a pet. J.B. explained that he was a big fan of the Pittsburgh Penguins hockey team and the Pittsburgh Riverhounds soccer team, and enjoyed watching their games on television. He was aware of the Pittsburgh Pirates baseball team and the Pittsburgh Steelers football team, but was not a fan of those teams because he did not like those sports. In addition to swimming at the University of Pittsburgh's pool facility, and

---

(D.N.M Nov. 18, 2015); *Anderson v. Acree*, 250 F.Supp.2d 876 (S.D. Ohio 2002); *Kosewski v. Michalowska*, 2015 WL 5999389 (E.D.N.Y. Oct. 14, 2015); *Falk v. Sinclair*, 2009 WL 4110757 (D. Me. Nov. 23, 2009).

attending summer camps at various locations in Pittsburgh, including the Carnegie museums, he also recalled taking trips to the Frick Art Museum and to the Carnegie Science Center.

In terms of his living arrangements, J.B. was aware that he had been in Pittsburgh for approximately one year. He knew that his parents were having a disagreement about staying in Pittsburgh, and that his father had told him he would only be in Pittsburgh for one year. Nonetheless, when ranking places in which he has lived, J.B. gave Pittsburgh first place, and Germany second. While he liked Germany, he informed the Court that the U.S. has many things that Germany does not, and that he could not think of anything bad about living in Pittsburgh. While J.B. had left some of his belongings in Germany, he had many belongings in Pittsburgh, and acquired more, e.g. stuffed animals, because his friends in Pittsburgh liked them. He stated that he had more and better friends in Pittsburgh than he had in Germany. J.B.'s father had family in other U.S. states, and J.B. had gone to visit them around the Christmas holiday. His mother's brother also came from Europe to visit once during the past year. Petitioner came to the U.S. for extended visits with J.B. on two or three occasions, and otherwise maintained regular contact via video conferencing. J.B. usually spoke with his father on Saturdays and Sundays.

J.B.'s account of his time in Pittsburgh was further bolstered by what the Court considers to be the credible trial testimony of Marci Hricik, J.B.'s second grade teacher, Kristi Woolsey, organizer of J.B.'s robotics team and mother to one of J.B.'s friends, Lauren Seaman, J.B.'s swimming coach/instructor, Olga Kim, close friend of Respondent, Olga Klimova-Magnota, close friend of Respondent with whose family J.B. has spent significant time, Sumaya Minawer and Thamer Alharbi, parents of one of J.B.'s friends, Augusto Villalba Fernandez De Castro,

father to one of J.B.'s friends and a coach in J.B.'s soccer league, and Timothy Barr, close friend and colleague of Respondent.

Altogether, J.B.'s record of academic achievement and engagement at Colfax, significant social contacts, wide ranging extracurricular activities, substantial familiarity with Pittsburgh, its institutions, and its culture, and unequivocally favorable opinion of all the above, demonstrate that J.B. has not only "formed meaningful connections with the people and places [he] encountered" in Pittsburgh, *Karkkainen*, 445 F.3d 294 (internal quotation marks and citation omitted), but that his life has attained "'a sufficient degree of continuity to be properly described as settled.'" *Yang*, 499 F.3d at 273 (quoting *Feder*, 63 F.3d at 223).

The above notwithstanding, and as previously noted by the Court, parental intent is still part of the Court's inquiry. *Karkkainen*, 445 F.3d at 292. Evidence of shared intent by the parties – or a lack thereof – can trump evidence of acclimatization, particularly when the child is young. *Id.* at 296 – 97. In the present case, the shared intent of Petitioner and Respondent is far from clear. The only facts upon which Petitioner and Respondent could agree were that J.B. was to accompany Respondent to Pittsburgh for at least a year while she completed her graduate degree.

At trial, Respondent argued that the agreement was that J.B. was to stay with her until she completed her graduate degree, but that she never committed to a specific time frame because she could not guarantee a certain end date for her studies. She is presently hoping to be finished by April 2017, and has secured employment at the University of Pittsburgh for the 2016 – 17 academic year. (Exhibit 37). Respondent also stated that she and Petitioner had seriously discussed relocating to the U.S.; Petitioner allegedly informed her that he would be looking for

11

work in the U.S. while Respondent and J.B. lived in Pittsburgh. Respondent claimed that the parties never intended to live in Germany permanently.

Respondent elaborated upon the parties' arrangement at trial, explaining that after spending two years in Pittsburgh and two years in Germany, J.B. was to accompany Respondent in Pittsburgh until she finished her graduate degree. During the parties' frequent moves around Europe to accommodate Petitioner's career, Respondent was always J.B.'s primary caretaker; therefore, it made sense for J.B. to live with her. In addition, her schedule had always been more flexible, and Petitioner often worked long hours. With respect to reserving a spot at the JFK School for the 2016 – 17 academic year, Respondent stated that it was only meant as a contingency in the event that she was able to complete her graduate degree in one year and find a post-doctoral position in Berlin. (Exhibit K). However, Respondent felt that moving J.B.'s residence so frequently would be detrimental to his well-being.

When addressing the Court at trial, Petitioner contested Respondent's testimony to the effect that the parties had never agreed to limit the amount of time J.B. would live in the U.S. In support of his position, Petitioner relied heavily upon several pieces of evidence. Of perhaps greatest significance was an exhibit presented by Petitioner to Respondent during cross-examination which contained excerpts from an email chain spanning February 24 through February 28, 2016. (Exhibit ZH at 29 – 44). An exchange between Petitioner and Respondent typical of this email chain states:

Petitioner:    I am glad to hear from you that you are not breaking the agreement of [J.B.'s] return.

\*\*\*

Respondent:    Chuck, you are not hearing me again – I am not breaking the agreement, it should be reconsidered, and [J.B.] should stay with me as primary caregiver. Please start paying attention to what I am saying.

(Exhibit ZH at 32 – 33). Petitioner believed this language to be definitive proof of an agreement limiting J.B.'s stay in the U.S. to one year. Respondent argued in response that the only agreement she made was that J.B. would accompany her to Pittsburgh until she completed her graduate degree. While this email is clearly indicative of the existence of an agreement, it does not speak to the specific terms of the agreement. Respondent stops short of acknowledging the terms of Petitioner's asserted agreement; in the following email, she even suggests the existence of an alternative, pre-existing agreement:

> Chuck, we had an agreement in Ireland that we both will go to the city where I would be accepted to a graduate program because your contract in Ireland had expired. You agreed to do it because you thought at the time that it would be fair, considering that I wasted two years in Ireland because you were working there. However, you did not do it, instead you went to Germany. At that moment the agreement was changed – the previous agreement was no longer followed.

(Exhibit ZH at 37).

Interestingly, in a series of email exchanges on September 6, 2015, the parties' discussion seems to suggest that Petitioner may not have been able to take J.B. in Germany, or that the parties were contemplating allowing J.B. to decide where to live after one year in Pittsburgh:

Petitioner: I feel dirty about it because [J.B.] wants to come back here, and I'm pretty happy here but I just have to make more money.

\*\*\*

Respondent: As for [J.B.], things change quickly with him. He is pretty happy in Pittsburgh, so by the end of the year, going back to Berlin might not be exactly what he wants.

(Exhibit ZH at 62 – 63). Regardless, the evidence is equivocal with respect to the parties' mutual intent regarding the length of time J.B. would live in Pittsburgh with Respondent. The lack of obvious mutual intent in the emails undermines Petitioner's argument that J.B. cannot be considered a habitual resident of Pittsburgh.

13

Petitioner also noted that Respondent left behind belongings of J.B. when they moved to Pittsburgh. He argued that by leaving many of J.B.'s personal belongings behind in Germany, the parties were expressing an implied, mutual intent that J.B. was to return. Nonetheless, the Court notes that the same could be said for a mutual intent to return to Pittsburgh, because Respondent had left many personal items behind in storage from her previous two year residence in Pittsburgh with J.B. As with the email chains, this evidence is equivocal, at best, with respect to the parties' intent. It certainly says nothing of the time period in which J.B. would return to Germany. Further, Third Circuit jurisprudence regarding habitual residence has never "'enunciated a need for an intent to abandon a former habitual residency in order to establish a new one,'" only that the "'previous habitual residence has been left behind.'" *Karkkainen*, 445 F.3d at 294 (quoting *Whiting*, 391 F.3d at 550). The mere act of leaving personal items behind in Germany does not, therefore, demonstrate that the parties intended for Germany to remain J.B.'s habitual residence.

At the end of his case-in-chief, Petitioner presented the written declarations of several acquaintances in Germany, as well as that of Petitioner's brother, in support of his contention that the parties intended that J.B. return to Germany after one year.[7] (Exhibits ZK1 – ZK4). To the extent that these written statements were the product of a concerted effort by Petitioner and the drafting parties, the Court accords the statements diminished weight. (Exhibits ZL1 and ZL2; ZM1 – ZM3; ZN1 – ZN3). Additionally, several appear merely to parrot language directly

---

[7] On the second day of trial, August 17, 2016, Petitioner asked if the Court would allow him to call several declarants as witnesses via videoconference. Yet, Petitioner failed to include any of the declarants on his witness list despite having been informed by Order of this Court on July 15, 2016 that he was to have a list of witnesses prepared for submission by August 2, 2016 – which due date was extended until August 5 by Order of this Court on July 25, 2016. Additionally, Petitioner had over a week between the witness list due date and the start of trial to make his request, but failed to do so. As a result, Respondent's counsel received no notice of Petitioner's intent to call any witnesses or the need to prepare for same. The Court, therefore, denied his request. Nonetheless, Petitioner and Respondent testified at trial regarding their relationships with the declarants and how the declarations were procured, and the declarations were ultimately admitted as exhibits.

suggested by Petitioner, and are likewise afforded minimal significance. (*Id.*). Indeed, only the declaration of Heiko and Susanne Ress purported knowledge of an agreement for J.B. to return to Germany for the 2016 – 17 academic year based upon conversations with Respondent; the other declarants admitted only to gaining such knowledge through conversations with Petitioner. (Exhibit ZK2).

Courts presiding over cases in which a "'child's initial move from an established habitual residence was clearly intended to be for a specific, limited duration,'" have typically found that there was no change in habitual residence. *Karkkainen*, 445 F.3d at 291 n. 3 (quoting *Whiting*, 391 F.3d at 549). However, in light of this Court's review of all the exhibits admitted on the record, and based upon observation of the parties during their testimony in the courtroom and *in camera*, the credibly established facts as found by this Court[8] do not prove the existence of such an agreement in the instant case by a preponderance of the evidence. Beyond agreeing that J.B. would reside with Respondent when she traveled to Pittsburgh for school – as he had in the past – the Court finds that there was no credible evidence of an agreement for a specific duration. Moreover, there is absolutely no evidence that Respondent ever agreed to J.B. residing alone with Petitioner in Germany.

A "'child *can* lose its habitual attachment to a place even without a parent's consent'…when 'the objective facts point unequivocally' to the conclusion that a child's relative attachments to two countries have changed." *Karkkainen*, 445 F.3d at 297 (quoting *Mozes v. Mozes*, 239 F.3d 1067, 1081 (9th Cir. 2001)). The credible facts, as found by this Court, clearly indicate that said attachments have shifted for J.B. Thus, in light of the lack of evidence of an

---

[8] In a bench trial, it is the province of the judge sitting as the trier-of-fact to evaluate the credibility of witnesses and weigh the evidence. *Brisbin v. Superior Valve Co.*, 398 F.3d 279, 288 (3d Cir. 2005) (citing *Scully v. U.S. WATS, Inc.*, 238 F.3d 497, 506 (3d Cir. 2001)). Having viewed the demeanor of a witness first-hand during a bench trial, the judge sits in the best position to determine the veracity of the witness's testimony. *Gov't of the V.I. v. Bryan*, 29 F.App'x 65, 68 (3d Cir. 2002).

agreement regarding a specific duration for J.B.'s stay in Pittsburgh, as well as the Court's determination that Respondent exhibited a greater degree of credibility than Petitioner, and given the strong evidence of J.B.'s acclimatization, the Court finds J.B.'s habitual residence to be Pittsburgh. Respondent's retention is not wrongful, and the Court's analysis need go no further.

V.     **Conclusion**

Based upon the foregoing, the Court found that Petitioner failed to prove by a preponderance of the credible evidence that J.B.'s habitual residence was other than in Pittsburgh, Pennsylvania, and as a result, that Respondent's retention of J.B. in Pittsburgh was wrongful under the Hague Convention and ICARA. Accordingly, the Court properly denied all relief sought in Petitioner's Complaint and Petition.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

cc:     Olga Grigorievna Blackledge
olga.blackledge@gmail.com

Barbara Ernsberger, Esq.
behrendlawyers@aol.com

Charles Wesley Blackledge
cwblackledge@hotmail.com